UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                          :
VERNA M.[1],                     :            3:21-CV-1590 (MPS) (RMS)
*Plaintiff,*                   :
                          :
V.                             :
                          :
KILOLO KIJAKAZI,[2] ACTING       :
COMMISSIONER OF SOCIAL        :
SECURITY,                    :
*Defendant.*                 :
                          :           DATE: November 28, 2022
                          :
------------------------------------------------------ x

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security (the "Commissioner"), denying the plaintiff disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").[3]  For the reasons set forth below, the Court respectfully recommends that the plaintiff's

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. *See* 42 U.S.C. § 405(g).

[3] While the plaintiff's applications for DIB under Title II and SSI under the Title XVI of the Social Security Act were both denied, her complaint only checked a box requesting review of her SSI denial under Title XVI.  (*See* Doc. No. 1 at 2).  The Court treats this "as a scrivener's error which resulted in neither substantive error in the plaintiff's briefing nor prejudice to the Commissioner."  *Kelly W. v. Kijakazi*, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *1 (D. Conn. Sept. 17, 2021).  The ALJ indeed reviewed the claim under both DIB and SSI statutes which are analytically identical, *see id.*, and found the plaintiff not disabled.  (Tr. 22).  Moreover, "[i]n their memoranda, both parties' arguments address the Commissioner's decisions with respect to both DIB and SSI[.]" *Kelly W. v. Kijakazi*, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *1.  (*See* Doc. No. 12-1 at 1; Doc. No. 14-1 at 1).  Therefore, "the court will treat the pleadings as amended to address [the plaintiff's claims under Title XVI as well as Title II.  *Id.*

Motion for Order Reversing the Decision of the Commissioner (Doc. No. 12) should be **GRANTED**, to the extent the plaintiff seeks a remand for further administrative proceedings, and the defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 14) should be **DENIED**.

## I.      <u>ADMINISTRATIVE PROCEEDINGS</u>

The plaintiff filed an application for SSI and DIB on January 14 and 17, 2020, respectively, claiming that she had been disabled since December 1, 2019, due to migraine headaches, and issues with her lungs, lower back, shoulders, and arms. (Doc. No. 8, Certified Transcript of Administrative Proceedings, dated December 23, 2021 ["Tr."] 210, 212). The plaintiff's applications were denied initially on March 17, 2020, and upon reconsideration on June 26, 2020. (Tr. 68-107). On November 18, 2020, a hearing was held before Administrative Law Judge ("ALJ") Louis Bonsangue, at which the plaintiff and a vocational expert testified. (Tr. 31-66). On March 12, 2021, the ALJ issued an unfavorable decision, denying the plaintiff's claims for both SSI and DIB benefits. (Tr. 12-22). On April 13, 2021, the plaintiff requested review from the Appeals Council. (Tr. 204-06). The Appeals Council denied the request on October 1, 2021, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On November 30, 2021, the plaintiff filed her complaint in this pending action. (Doc. No. 1). Absent consent to a Magistrate Judge, this case was referred to the undersigned for all purposes, including issuing a recommended ruling. (Doc. No. 11). On March 27, 2022, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 12) with a Statement of Material Facts (Doc. No. 12-2) and a brief in support (Doc. No. 12-1). On May 6, 2022, the Commissioner filed her Motion to Affirm (Doc. No. 14), with a Statement of Material Facts (Doc. No. 14-2) and a brief in support (Doc. No. 14-1). The plaintiff did not file a response.

## II.    FACTUAL BACKGROUND

The plaintiff was 59 years old on the alleged disability onset date.  (Tr. 80).  Prior to the onset date, she was an active smoker with a history of mild chronic obstructive pulmonary disorder ("COPD"). (Tr. 96, 411).[4]   In October 2019, the plaintiff presented to the emergency room complaining of worsening lower back pain.  (Tr. 429).  This lumbar pain progressed over the following months, and MRI imaging was ordered by her primary care physician, Dr. Elena Titko, which revealed mild lumbar spondylosis.  (Tr. 469).  Over the course of following months through October 2020, the plaintiff was prescribed various pain medications and seen repeatedly by pain management providers at PCA Pain Care for complaints of lower back pain.  (*See* Tr. 1138-1140). With respect to the plaintiff's specific medical history, the court assumes familiarity with the plaintiff's medical chronology, (Doc. No. 12-2), and the Commissioner's response to the plaintiff's statement of her medical chronology, which is stipulated in the parties' respective Statement of Material Facts.  (*Id.*; Doc. No. 14-2). Though the Court has reviewed the entirety of the record, it cites only the portions of the record that are necessary to explain this decision.

### A.    THE PLAINTIFF'S HEARING TESTIMONY

On November 18, 2020, the ALJ held a telephonic hearing during which the plaintiff, her attorney, and a vocational expert testified.[5]  (Tr. 33).  On the date of the hearing, the plaintiff was 59 years old and living alone.  (Tr. 39-40).  She graduated from high school and obtained a

---

[4] While the plaintiff claimed disability on account of her COPD being a severe medical impairment, the ALJ found that "[a]s for her diagnosis of COPD, pulmonary examinations throughout the record have been normal requiring only maintenance medications."  (Tr. 20).  The plaintiff takes no issue with this determination on appeal, and, as such, the Court does not address it.

[5] The hearing was held telephonically due to the coronavirus pandemic.  (Tr. 33-34).  The ALJ surveyed each participant to confirm that they were alone and that there were no other parties listening to the proceeding to ensure the plaintiff's privacy.  (*Id.*)

certificate to work as a personal care assistant ("PCA"), which is akin to a home health aide.  (Tr. 39).

The ALJ first examined the plaintiff about her prior work experience.  The plaintiff testified that, between 2007 and 2011 (twelve to thirteen years prior to her claim), she worked at an adult vocational school as a "telemarketer for two years" before being promoted to supervisor of the telemarketing department, a position she held for at least the next two years.  (Tr. 40-41).  In both these jobs, the plaintiff would be seated at desk on a computer and would place calls to prospective and current students.  (Tr. 42-43).  However, the plaintiff further testified that these telemarketing roles required her to do "a lot of walking" as she would give school tours, meet with students, and "take . . . staff out to learn how to bring in students."  (Tr. 41).  The plaintiff conducted approximately six or seven school tours daily, which required the plaintiff to go down at least two flights of stairs and walk between buildings.  (Tr. 43-44).  She was also required, on occasion, to lift boxes of printer paper.  (Tr. 41).

After her telemarketing job, the plaintiff found work as a PCA.  (Tr. 40-41, 44).  In this role, the plaintiff assisted clients at their homes with dressing, bathing, cleaning and other small household tasks, and occasional lifting.  (Tr. 44-45).  The plaintiff would drive a car to get to her clients' homes.  (Tr. 46).  She stopped working as a PCA between December 2019 and July 2019.  (Tr. 45).[6]  However, she did return to limited PCA work for the month of July, during which time she acted as a "companion" for nine hours each week (three hours a day, three days a week).  (Tr. 45-46).  As a companion, she was not required to lift or clean.  (*Id.*).  However, the plaintiff stopped doing this companion PCA work in August of 2019 because she could not "sit that long."  (*Id.*).

---

[6] The plaintiff noted that, while she did not receive any income from wages during this period, she did receive Section 8 benefits which covered various utilities. (Tr. 45).

Upon examination by her attorney, the plaintiff testified about her pain from a protruding spinal disc that "sit[s] very close to the nerve" causing pain in the lower-right quadrant of her back. (Tr. 47, 50). Specifically, she testified that, when the protruding disc hit her spinal nerve, a pain "goes down the right buttocks into the right leg." (*Id.*). This pain is "always there" and occurs while standing, sitting, or and "even while [] walking." (Tr. 59, 47). When it occurs while walking, she "can't even move" and has to "just stand right there." (Tr. 47). The plaintiff stated that, on a scale of one to ten, her standard baseline pain level was eight and increased to ten when the pain "hits," describing it as "crucial." (Tr. 49-50). She testified that she took pain medication which "help[ed] a bit" in mitigating the frequency of the pain but that she still "frequently" suffered from "breakthrough pain." (Tr. 49).

The plaintiff was examined on her ability to sit, stand, and walk. She testified that she could sit "at least half an hour" in a regular chair "before [she had] to get up and try to walk around." (*Id.*). After "about 15 minutes" of walking she would "be able to sit back down with some pillows." (Tr. 47.). The plaintiff testified she could stand in one place without walking for "maybe a half an hour" before needing to take a break and sit down. (*Id.*). She stated that she could walk on a flat surface, such as in a grocery store, for between a half hour to forty-five minutes before the pain hit her. (Tr. 49). However, the plaintiff explained that she had been doing her grocery shopping online because it hurt her to drive longer distances and, when she did go shopping in-person, she used a carriage. (Tr. 47).

The plaintiff was also examined on positioning, ability to do household tasks, and lifting. She testified that the most comfortable position for her was laying down but with pillows propping her up; she reported that she had slept in a similar fashion "on an angle but kind of sitting up" for the past two years. (Tr. 50). The plaintiff testified that her back pain kept her in bed approximately

18 hours each day.  (Tr. 51).  In the six hours each day when she was not in bed, the plaintiff testified she could shower and do limited cleaning chores such as sweeping or mopping but such activities required her to stop to "sit down for a minute before I can pick it up."  (Tr. 51).  The plaintiff testified that she could, at most, lift between "ten and twenty" pounds but "tr[ied] not [to] lift anything."  (Tr. 52).  Because of this limitation, the plaintiff would often put off doing laundry, which involved lifting and moving her laundry downstairs; she had not moved more "substantial" items like her furniture in more than two years.  (Tr. 51-52).

The plaintiff testified that, during the time she was in bed, she spent her time reading, watching television, or doing the crossword puzzles.  (Tr. 52).  However, the plaintiff stated that, when her pain occurs, it interferes with her ability to focus and concentrate to the point where "it just makes me not even want to read or watch T.V. or anything" and that such pain occurs for about six hours out of every day.  (Tr. 52-53).

The plaintiff also testified regarding her respiratory capabilities.  She explained that she had COPD, emphysema, and two lung nodules that cause "persistent coughing all of the time, as . . . [her] lungs fill up with fluid."  (Tr. 55, 58).  She testified to taking prednisone, a steroid to "clear that up and open the airway" as well as using a Spiriva inhaler once a day.  (Tr. 55-56).  She stated that she could "breathe pretty well" while walking such that she could walk for "maybe 30 to 45 minutes" with breaks and could mop floors but needed to use her inhaler.  (*Id.*).  She also said that certain conditions such as being rushed or having to use stairs exacerbated her breathing problems. (*Id.*).  She avoided chemical irritants such as cleaning agents, which she was required to use in her duties as a PCA and claimed that even steam affected her breathing (though she still showered). (Tr. 56-57).  The plaintiff had been a smoker since 2009 and, at the time of the hearing, smoked

"about two cigarettes a day."  (Tr. 57-58).  The plaintiff testified that she had previously taken Chantix which helped her quit smoking for at least two months.  (*Id.*).

**B.      THE VOCATIONAL EXPERT'S TESTIMONY**

Dr. Steven B. Sachs testified as an impartial neutral vocational expert (the "VE") at the hearing.  (Tr. 59).   Drawing from the plaintiff's testimony and review of her file, the VE summarized the plaintiff's past work as corresponding to a Telemarketer (DOT 288.357-014) and Home Health Aide (DOT 54.377-014), as defined in the Dictionary of Occupational Titles ("DOT").[7]  (*Id.*).  While the DOT defines the Telemarketer job as having a vocational preparation rating ("SVP") of 3 and a "sedentary" exertion level, the VE opined that, as performed by the plaintiff, he considered the job to have an SVP of 4 and "light"[8] exertion level given the walking and tours involved.  (Tr. 59-60).   The VE opined that the plaintiff's Home Health Aide job had an SVP of 3 and an exertion level of "medium."  (*Id.*).  The VE further opined that, though there was "not really a specific DOT for" the plaintiff's prior job as the supervisor of telemarketers, the work was the functional equivalent of being a DOT Telemarketer doing "light" work except with a higher SVP of 5 because it required "more responsibility supervising others."  (*Id.*).

---

[7] VEs may use the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") to opine whether a hypothetical person with impairments mirroring the claimant's can perform any of the claimant's past jobs or whether there are any jobs in the local or national economy that such a person could perform. DOT definition also supplies a job's given SVP rating and exertion level.  *See* 20 CFR § 404.1566(d)(1).

[8] *See* 20 CFR § 404.1567(b); SSR 83-10 ("The [SSDI] regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.").

The ALJ examined the VE on several hypothetical individuals' ability to perform the plaintiff's past job as a telemarketer and telemarketer supervisor.[9]  (Tr. 59-64).  In the first hypothetical, the ALJ proposed an individual with the same age, education, and past work as the plaintiff, and the following relevant working restrictions: light exertional level; should only occasionally climb any ramps or stairs; limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing or walking up to six hours in an eight-hour day; and sitting six hours in an eight-hour day.[10]  (Tr. 59-60).  With these limitations, the VE opined that the hypothetical individual could perform the work of both the telemarketer and telemarketer supervisor consistent with both the DOT specification and as performed.  (Tr. 61).  Regarding the telemarketer job, the VE testified that it would allow for the individual to sit and stand at will throughout that day.  (*Id.*).  The VE also affirmed that the job could be performed even if it required a sit-stand option, though he explained that this opinion was based on his own knowledge of how the job is generally performed in the national economy because the DOT did not address any sit-stand option for the job.  (Tr. 61, 63).

In the second hypothetical, the ALJ assumed an individual with the same description as the first, including a requirement for a sit-stand option, except with a further limitation of standing and walking only four hours in an eight-hour day.  (Tr. 62).  The VE opined that this would not change his opinion that the hypothetical individual could still perform the work of a telemarketer.   In the ALJ's third hypothetical, the individual was further limited to a sedentary exertional level, limited to lifting, carrying up to ten pounds occasionally, less than ten pounds frequently, limited to

[9] The VE opined that any work as a home health aid would be precluded.  (Tr. 63).

[10] Other restrictions on the hypothetical individual included: never climbing and ropes, ladders, or scaffolds; frequent balancing; occasional stooping, kneeling, crouching and crawling; needing to avoid extreme temperature; needing to avoid concentrated exposures to fumes, odors, dust, gasses, and poor ventilation; and avoiding all exposure to moving party and unprotected heights.  (Tr. 60).

standing and walking for two hours per day, sitting six hours per day, and required the ability to change positions from sitting and standing throughout the day. (*Id.*). The VE opined that this hypothetical individual could still perform the work of a telemarketer "as generally performed . . . per DOT[.]" (Tr. 63).

The ALJ further inquired whether, in any of the hypotheticals, past work would be precluded in general or as performed if the individual was "off-task" more than 10 percent every day in order to change positions from sitting to standing. (Tr. 64). The VE opined that such past work would be precluded as the threshold for off-task behavior was ten percent. (Tr. 64, 65). The VE further opined that the plaintiff had not acquired any skills in her past work that would be transferrable to any light or sedentary jobs in the national economy that would tolerate more than ten percent off-task time. (*Id.*).

The plaintiff's counsel also examined the VE and queried whether, if the first hypothetical was changed to a sit-stand-walk scenario where, for every half-hour of sitting, the worker needed to get up and walk for ten to fifteen minutes, it would be possible for a worker to remain on task during the walking portion of the day. (Tr. 64). The VE opined that it was "apparently . . . not likely generally speaking," unless the job at issue had duties assigned to do tasks during these otherwise "off-task" times. (Tr. 64-65). The VE further opined that the threshold for absenteeism would be eight time a year and that, if a worker was limited to only occasional public contact due to pain and an inability to deal with other people "sometimes," that it would preclude working as a telemarketer. (Tr. 65).

## III.   **THE ALJ'S DECISION**

The ALJ issued an unfavorable decision on March 17, 2021.  (Tr. 12, 22).  Following the

five-step sequential evaluation process for determining whether an individual is disabled under the

Social Security Act ("SSA"), the ALJ made the following findings of fact and conclusions of law.[11]

At the first step, the ALJ found that the plaintiff had not engaged in substantial gainful

activity since December 1, 2019, the alleged onset date of the plaintiff's disability.  (Tr. 18).  At

the second step, the ALJ found that the plaintiff had the following severe impairments: chronic

obstructive pulmonary disease and degenerative disc disease of the lumbar spine. (*Id.*). The ALJ

further found that the plaintiff had the following medically determinable, "non-severe"[12]

impairments: essential hypertension, obesity, and diabetes mellitus.  (*Id.*).

At the third step, the ALJ found that the plaintiff did "not have an impairment or

combination of impairments that me[t] or medically equal[ed] the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  (*Id.*).  Specifically, neither of

plaintiff's severe spinal or respiratory impairments met or were medically equivalent to any

---

[11] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[12] An "impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. 18 (citing 20 C.F.R. § 404.1522; 416.922; SSRs 85-28, 16-3p)).

impairment listed in Appendix 1.  As to the plaintiff's degenerative lumbar spinal disc disease, the ALJ concluded that the plaintiff's "impairments do not meet or medically equal listing 1.04 for disorders of the spine. There is no evidence of requisite nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in inability to ambulate effectively." (Tr. 18).  As to the plaintiff's COPD, the ALJ concluded that the plaintiff's "impairments do not meet or medically equal listing 3.02 for chronic disorders of the respiratory system. There is no evidence of a one-second forced expiratory volume (FEV1) less than or equal to the values in Tables I, a forced vital capacity (FVC) less than or equal to the values in Table II, or chronic impairment of gas exchange as demonstrated in Tables III, IV or V. Additionally, the claimant has not required three hospitalizations at least 30 days apart within a 12-month period for exacerbations or complications of a chronic respiratory disorder." (Tr. 19).

At the fourth step, the ALJ found the plaintiff's residual functional capacity ("RFC") to be, in relevant part, as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except the claimant is limited to lifting/carrying 10 occasionally and less than 10 pounds frequently, standing/walking 2 hours, and sitting 6 hours; the claimant requires the ability to change positions from sitting and standing throughout the day; occasionally climb ramps/stairs.

(Tr. 19).

The ALJ found that the plaintiff's medically determinable impairments of her lower back, lungs, shoulders and arms as well as migraine headaches "could reasonably be expected to cause [her] alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 19).  In support of this RFC finding, the ALJ cited evidence from Alliance Medical, PCA Pain Care, and a lumbar MRI. (Tr. 20).  The ALJ also considered

the medical opinions of state agency medical consultants Gerald Fette, M.D., and Lois G. Wurzel, M.D., finding them "partially persuasive."[13]  (Tr. 20).  In addition, the ALJ considered the Medical Source Statement (MSS) signed by Dr. Yelena Titko[14] and found it "partially persuasive."   (Tr. 20-21).

Given this RFC and the testimony of the vocational expert, the ALJ found that the plaintiff was "capable of performing past relevant work as a telemarketer" "as generally performed" and that "[t]his work does not require the performance of work-related activities precluded by" the plaintiff's RFC.  (*See* Tr. 21-22).  The ALJ accordingly found her not disabled.  (*Id.*).

## IV.  <u>STANDARD OF REVIEW</u>

"The review of a Social Security disability determination involves two levels of inquiry." *Juan T. v. Kijakazi*, No. 3:20-CV-1869(SALM), 2021 WL 4947331, at *1–2 (D. Conn. Oct. 25, 2021).  "First, the Court must decide whether the Commissioner applied the correct legal principles in making the determination."  *Id.*  "Second, the Court must decide whether the determination is supported by substantial evidence."  *Id.* (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)). Substantial evidence is more than a "mere scintilla."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quotation marks omitted).

However, "[t]he Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly."  *Juan T.*, 2021 WL 4947331, at *1–2 (citation omitted).  *See Townley*

---

[13] "A medical opinion is a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [they]  have one or more impairment-related limitations or restrictions in the abilities listed in" the regulation. 20 C.F.R. § 404.1513(a)(2)

[14] The Court notes that the ALJ's decision repeatedly misspelled Dr. Titko's name but uses her correct name here.

*v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled.").  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

## V.   **DISCUSSION**

The plaintiff claims that the ALJ erred in two respects.  First, the plaintiff contends that the ALJ incorrectly evaluated the medical opinions and "substituted his judgment for that of all opinion physicians, and particularly Ms. Myer's treating physician." [15]  (*See* Doc. No. 12-1 at 2, 9-11).  Second, the plaintiff argues that the ALJ erred in his step four analysis by finding that the plaintiff could return to her prior work as a telemarketer as that job is generally performed. [16]  (*See* Doc. No. 12-1 at 6-9).  As to this latter claim, the plaintiff argues that the ALJ's decision was erroneous in part because the ALJ failed to consider whether her previous telemarketing job was actually a "composite job," *i.e.*, a job containing significant elements of two or more occupations. (*Id.*).  For the reasons explained below, the Court concludes that the ALJ did not apply the correct legal standard in considering the medical opinion evidence and recommends remand on that

---

[15] While the plaintiff claimed disability on account of her COPD being a severe medical impairment, the ALJ found that "[a]s for her diagnosis of COPD, pulmonary examinations throughout the record have been normal requiring only maintenance medications." (Tr. 20).  The plaintiff takes no issue with this determination on appeal and only addresses arguments related to her ability to sit and otherwise do sedentary work. (*See* Doc. No. 12-1 at 10).  Accordingly, the Court only directs its review to this issue.

[16] Social Security regulations state that an ALJ will consider prior work experience at step four "when it was done within the last 15 years, lasted long enough for [the claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 404.1565.  Because the VE opined that any work as a home health aide would be precluded, (*see* Tr. 63), the ALJ instead focused his discussion on whether or not the plaintiff could perform her prior work as a telemarketer, a gainful job she had learned and performed within the fifteen-year lookback period. (*See* Tr. 21-22).

ground.  Upon remand, the ALJ should re-evaluate his entire step four analysis and should additionally consider whether the plaintiff's prior work was also a composite job.

### A.    THE ALJ DID NOT APPLY THE CORRECT LEGAL STANDARD IN ARTICULATING THE WEIGHT OF MEDICAL OPINION EVIDENCE

The plaintiff contends that the ALJ "substituted his judgment for that of all opinion physicians, and particularly Ms. Myer's treating physician," Dr. Elena Titko.  (Doc. No. 12-1 at 2).  As an initial matter the plaintiff appears to argue that the ALJ failed to apply the treating physician rule and give Dr. Titko's opinion "extra weight."[17]  (*Id.* at 11).  "In making this argument, however, Plaintiff has cited outdated case law applying an old regulatory scheme that is no longer applicable; the applicable regulations no longer require the ALJ to give opinions of treating physicians any specific evidentiary weight, including controlling weight." *Roxanne C., Plaintiff, v. Kilolo Kijakazi, Commissioner Of Social Security, Defendant.*, No. 3:21-CV-172(SVN), 2022 WL 4285695, at *6 (D. Conn. Sept. 16, 2022).  *See Juan T.*, 2021 WL 4947331, at *4 ("Under the new Regulations, 'no particular deference or special weight is given to the opinion of a treating physician.'" (quoting *Quiles v. Saul*, No. 19-cv-11181(KNF), 2021 WL 848197, at *9 (S.D.N.Y. Mar. 5, 2021)).  Instead, because the plaintiff filed her benefit applications after March 27, 2017, (s*ee* Tr. 210-211; 212-217), the Court reviews her claims under the new regulations found at 20 C.F.R. § 404.1520c for DIB claims and 416.920c for SSI claims.[18]  *See Sheila Renee H., Plaintiff, v. Kilolo Kijakazi, Acting Comm'r of Soc. Sec., Defendant.*, No. 3:21-CV-00944(TOF), 2022 WL 4181723, at *11 (D. Conn. Sept. 13, 2022) ("Because the Plaintiff

---

[17] "For claims filed prior to March 27, 2017, the SSA followed the 'treating physician rule,' which required the agency to give controlling weight to a treating source's opinion, so long as it was well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record." *Juan T. v. Kijakazi*, No. 3:20-CV-1869(SALM), 2021 WL 4947331, at *5 (D. Conn. Oct. 25, 2021).  *See* 20 C.F.R. 404.1527(c).

[18] Because these regulations are textually and functionally identical for both DIB and SSI, the Court may only refer to one of them or use them interchangeably.

filed her application after that date, the new regulations apply to her claim." (record citation omitted)).

Under the new regulations, an ALJ must "articulate in [the] determination or decision how persuasive [the ALJ] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 416.920c(b). *Accord Juan T.*, 2021 WL 4947331, at *5. An ALJ must make this finding whenever a medical source provides a "medical opinion," *i.e.,* a statement about what a claimant can still do despite any impairments and whether the claimant has one or more impairment-related limitations or restrictions on, *inter alia*, physical or mental demands of work activities. *See* 20 C.F.R. § 404.1513(a)(2). When determining the persuasiveness of a given medical opinion, an ALJ must consider its "supportability; its consistency; the length of the source's treating relationship with the claimant, including the frequency of examinations and the purpose and extent of the relationship; the specialization of the source; and 'other factors that tend to support or contradict a medical opinion.'" *Sheila Renee H.*, 2022 WL 4181723, at *11 (quoting 20 C.F.R. § 416.920c(c)).

The "most important factors" to be considered are supportability and consistency and, accordingly, "[i]n his written decision, the ALJ must explicitly articulate how he considered the supportability and consistency factors." *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)). However, the ALJ "may, but is not required to, explain how he considered the other factors" in writing. *Id.* (citing 20 C.F.R. § 416.920c(c)). "Provided that the ALJ follows these legal principles, and further provided that his decisions are supported by substantial evidence, his treatment of a given medical opinion is entitled to deference from the Court." *Id.*

As to "supportability," "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior

administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520(c)(1).  As to "consistency," "the more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at (c)(2).  "Although the treating physician rule has technically been eliminated from regulations, courts within the Second Circuit have proven that the essence of the treating physician rule lives on." *Migdalia C. v. Kijakazi*, No. 3:21-CV-00592-RAR, 2022 WL 3368583, at *4 (D. Conn. Aug. 16, 2022).  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01 ("These same factors [of supportability and consistency] also form the foundation of the current treating source rule, and we believe that it is appropriate to continue to keep these factors as the most important ones we consider in our evaluation of medical opinions and prior administrative medical findings.").

### 1.      Dr. Titko's MSS Opinion

As an initial matter, the Court observes that Dr. Titko has had a significant treating relationship with the plaintiff as she reports having seen the plaintiff every "3-4 months for the last 7 years."  (Tr. 1212; *see, e.g.*, Tr. 354 (Aug. 7, 2016, visit); Tr. 512 (Jan 9, 2020, visit), Tr. 526 (ordering MRI)).  While the ALJ was not required to address specifically his consideration of the length of this treating relationship, "it bears noting that the new Regulations explicitly acknowledge that 'a medical source may have a better understanding of [a claimant's] impairments if he or she examines [the claimant] than if the medical source only reviews evidence'" in a file. *Juan T.*, 2021 WL 4947331, at *6 (quoting 20 C.F.R. § 416.920c(c)(3)(v)).

However, in rendering his RFC determination, the ALJ found that Dr. Titko's December 2020 Medical Source Statement ("MSS") was only "partially persuasive."  (Tr. 21 (citing MSS at Tr. 1212)).  Specifically, the ALJ opined:

> Dr. [Titko] opined that [the plaintiff] could stand/walk less than 1 hour; sit less than 1 hour; lift 10 pounds, carry 10 pounds . . . The limitations contained in the MSS appear to overstate her limitations. The physical examination findings throughout the record nor the mild disc pathology supports a gross limitation in her ability to sit. (Exhibits 6F, 7F, pgs. 24-25, 8F, & 15F). Furthermore, Dr. [Titko] opines that the [plaintiff] could not continue as a CNA, but is silent on sedentary work, such as the telemarketing job.  Also, the doctors use of conditional language such as "it depends" and "probably" further decreases the persuasiveness of the opinion.

(Tr.  21).

The plaintiff argues that the ALJ "substituted his judgment for that of treating physician Dr. Titko" and that "the ALJ does not have the expertise that a treating physician has to determine that the 'limitations contained in the MSS appear to overstate her limitations.'"  (Doc. No. 12-1 at 10).  As explained above, the treating physician rule has been changed, and the old rule, which required deference to the opinions of treating physicians, no longer applies.   However, there is a legal standard for considering the medical opinions of medical sources, and an ALJ must follow that standard.  Here, the Court finds that "the ALJ failed to adequately explain the supportability and consistency factors underlying his conclusion that" Dr. Titko's MSS opinion was only partially persuasive.  See *Juan T.*, 2021 WL 4947331, at *8 (citing 20 C.F.R. § 416.920c(b)(2)).  This error requires a remand.  *Migdalia C.*, 2022 WL 3368583, at *5 (citing same).

The Second Circuit has held that an ALJ "commit[s] procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record."  *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022).  Such error generally warrants "remand with instructions to reconsider the disability claim consistent with the procedural mandates of the governing regulations."  *Id.* at *3 (citation omitted).  However, "[d]espite the

ALJ's procedural error, [a court] could affirm if 'a searching review of the record' assures [] 'that the substance of the [regulation] was not traversed'" or the error is "harmless." *Loucks*, 2022 WL 2189293, at *2 (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)). This is not the case here.

### a.    Supportability.

Dr. Titko's MSS is dated December 3, 2020 and indicates that she relied upon the plaintiff's history and medical files, progress and office notes, physical examinations, and an MRI in rendering her MSS opinion. (Tr. 1215). The Court assumes for the purposes of this analysis that Dr. Titko only relied on those records held by her employer, Alliance Medical, discussed below. While this Court's task is not to reweigh the evidence, a review of the available records in the transcript shows that her opinion regarding the plaintiff's ability to sit appears supported by relevant, objective medical evidence. Yet, the ALJ cites only one MRI ordered by Dr. Titko from January 2020 in finding Dr. Titko's MSS only "partially persuasive." (*See* Tr. 21).

For example, an October 15, 2019, treatment note indicates that the plaintiff presented to Alliance Medical for "backache and back pain." (Tr. 429). The note states that the plaintiff had gone to the emergency room two weeks prior for back pain, had limited relief with Tramadol and that her pain returned. (*Id.*). Upon a physical examination, the provider stated that the plaintiff's back had an abnormal and limited range of motion ("ROM") and that the "pain is constant but worsens with walking and bending. No relieving factors [were] identified." (Tr. 429-432). Physical therapy was recommended with MRI imaging to follow if that therapy was unsuccessful. (Tr. 432.)

On January 9, 2020, the plaintiff again presented to Alliance Medical complaining of back pain. (Tr. 508). This time the treatment note was signed by Dr. Titko herself. (Tr.512). The treatment note explicitly states that the plaintiff has had

> back pain for many years . . . but this episode of back pain started about 5 months ago and lately is has been progressively worsening . . . Despite [medication and physical therapy] . . . there is no improvement in her back pain and rather it has been worsening. She unable to work as for the last 1 months . . . [and] she reports a constant 8/10 low back pain that frequently worsens [] with walking, bending, or *sitting*.

(*Id.*) (emphasis added).

Upon physical examination, the plaintiff's back ROM was found to be "abnormal," and the treatment note reports that the plaintiff had "significantly restricted ROM of [her] back in all directions, point tender at L4/L5 level, no paraspinal muscle tenderness, SLR test+ on right side, back pressure noted when left leg lifted up." (Tr. 511). Under the section marked "Plan," the note states, "worsening low back pain . . . with radiculopathy likely disc herniation with poss[ible] nerve root compression . . . limiting daily activities." (*Id.*). Dr. Titko ordered an MRI of the plaintiff's lumbar spine. (*Id.*; Tr. 526).

The MRI of the plaintiff's lumbar spine taken January 23, 2020—and explicitly cited by the ALJ (*see* Tr. 21)—showed:

> L5-S1: disc desiccation without significant height loss. There's a disc bulge with a small superimposed right foraminal disc protrusion containing an annular fissure and facet arthropathy without significant central canal stenosis.
>
> Impression: Mild lumbar spondylosis from L2-L3 to L5-S1. There are mild disc bulges and mild facet arthropathy at these levels without significant central canal stenosis.

(Tr. 469 *repeated at* Tr. 482, 526).

Despite this relevant and objective evidence from Alliance Medical, including physical exams and an MRI, the ALJ provides no analysis as to *how* he came to his conclusion that Dr.

Titko's MSS opinion regarding the plaintiff's ability to sit is "overstated" or otherwise unsupported by objective medical evidence beyond obliquely citing to treatment notes of PCA Pain Care taken between February and October 2020 (Exs. 6F, 8F, and 15F (Tr. 490, 574, 1137)) and the January 23, 2020 MRI ordered by Dr. Titko.   (Ex. 7F (citing Tr. 526-527)).   *See* 20 C.F.R. § 404.1520c(b)(2) (The ALJ "will explain *how* [they] considered the supportability and consistency factors for a medical source's medical opinions[.]" (emphasis added)).   While the PCA Pain Care records are relevant to the consistency inquiry, which looks to the record as a whole, the supportability inquiry looks to "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."   Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-0.   *See* 20 C.F.R. 404.1520c(c)(1). Here, this would mean the Alliance Medical evidence cited to by Dr. Titko in her MSS.

The ALJ fails to address in any fashion how the objective medical evidence discussed above supports or rather fails to "support a gross limitation in [the plaintiff's] ability to sit."   (Tr. 21).   At this juncture, the Court cannot conclude that the ALJ "arbitrarily substitute[d] his own judgment for competent medical opinion."   *Curley v. Comm'r of Soc. Sec. Admin.*, 808 F. App'x 41, 44 (2d Cir. 2020) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)) (internal quotation marks omitted).   But an ALJ must "*both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion."   *Migdalia C. v. Kijakazi*, No. 3:21-CV-00592-RAR, 2022 WL 3368583, at *6 (D. Conn. Aug. 16, 2022) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (emphases in original) (internal quotation marks omitted).   By merely citing to one MRI—an MRI that itself may support a limitation on sitting—without any further analysis, the ALJ has failed to adequately

to articulate his consideration of the supportability factor.[19]  This is legal error warranting remand. *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022).  *See Dana Marie M. v. Comm'r of Soc. Sec.*, No. 621-CV-458, 2022 WL 2314560, at *6 (N.D.N.Y. June 28, 2022) ("An ALJ is required to explain his or her consideration of these factors and is not entitled to generally assert that an opinion is 'consistent with' or 'supported by' the record, without further elaboration.").

The government contends that the ALJ properly considered the supportability factor on the grounds that the ALJ observed that the MSS is "silent on sedentary work" and that Dr. Titko used "conditional language." (*See* Doc. No. 14-1 at 7).  These contentions do not alter the Court's conclusion.  The regulation simply instructs the ALJ to consider the relevancy of the objective medical evidence and explanations "presented by [the] medical source" and nothing more.  *See* 20 CF 416.920c(c)(1).  The "more relevant" these both are, the "more persuasive" the ALJ should find the source's opinion.  *Id.*  Neither of the government's arguments goes to the relevancy of the evidence relied upon by Dr. Titko or her explanations.  In any event, it is unclear how Dr. Titko would have known to opine about sedentary work as the plaintiff last worked a sedentary job at the latest in 2011, (Tr. 302), and Dr. Titko did not start seeing the plaintiff until 2013 when she was working as a CNA.  (See Tr. 1212).  Further, as the government's statement of facts concedes, (*see* Doc. No. 14-2 at 1-2), Dr. Titko's "conditional" responses of "It depends (vary from day to day)" and "probably" were in response to the questions of (1) how often the plaintiff would require unscheduled breaks at work and (2) how often the plaintiff would need to "lie down/sit quietly"

---

[19] While the ALJ describes at least the January 9, 2020 Alliance Medical encounter earlier in his discussion of medical evidence, (*see* Tr. 20), he confusingly only cites to the MRI in his analysis of Dr. Titko's statement. If anything, his own explanation of that evidence support's Dr. Titko's analysis. *See id.* ("The claimant presented to Alliance Medical Group on January 9, 2020 for worsening back pain. . . Her musculoskeletal examination was significant for reduced range of motion, point tenderness, and positive straight leg raising on the right, but no sensory loss.").

during such breaks, respectively.  (*See* Tr. 1213).  Neither the ALJ nor the government make any attempt to explain how this observation might be unsupported under the evidence available.

On remand, the ALJ should explicitly consider and adequately explain the supportability of Dr. Titko's MSS as required under the new regulations.

**b.    Consistency.**

The ALJ's decision also fails adequately to articulate how Dr. Titko's MSS is consistent or inconsistent with the record as a whole.  *See* 20 C.F.R. § 1520c(c)(2).  The consistency factor is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, not just what a medical source had available to them." *Rodriguez v. Kijakazi*, No. 21 CIV. 2358 (JCM), 2022 WL 3211684, at *13 (S.D.N.Y. Aug. 9, 2022) (citation and internal quotation marks omitted).  "While an ALJ is entitled to reconcile conflicting evidence in the record, and need not address every last piece of medical evidence when conducting this analysis, the ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence." *Id.* (citation and internal quotation marks omitted).

Again, the ALJ's analysis of Dr. Titko's opinion consists of a single sentence: "The physical examination findings throughout the record nor the mild disc pathology supports a gross limitation in her ability to sit."  (Tr. 20).  Here, "[t]he ALJ did not explicitly explain his consideration of the consistency" of Dr. Titko's opinion with other record medical and nonmedical evidence as the regulation requires. *Dana Marie M.*, 2022 WL 2314560, at *7.  The ALJ thus committed legal error. *See Loucks*, 2022 WL 2189293, at *2.  *See also Rodriguez*, 2022 WL 3211684, at *12 ("An ALJ also cannot simply reject an opinion without explaining how the

source's findings are inconsistent with the particular restrictions assigned, as doing so impermissibly substitutes the ALJ's expertise for that of a medical professional." (cleaned up)).

However, recent precedent instructs that this procedural error may be excused if it harmless.  *See Loucks*, 2022 WL 2189293, at *2 (concluding that the ALJ's failure to sufficiently explain how it considered the supportability and consistency factors is harmless error where "a searching review of the record" assures the court that the substance of the [regulation] was not traversed.").  Here, the ALJ cites wholesale to the records of PCA Pain Care after his analysis, (Tr. 21), but fails to "explicitly articulate how he considered the . . .  consistency of the medical opinion" in relation to them and therefore the court cannot be assured that the substance of the regulation was followed.  *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *7 (D. Conn. July 20, 2022).  *Cf. Pamela P. v. Saul*, No. 3:19-CV-575 (DJS), 2020 WL 2561106, at *5 (N.D.N.Y. May 20, 2020) (explaining that 20 C.F.R. § 416.920c(b)(2) text "is consistent with an ALJ's longstanding duty to fully explain exactly how a particular medical opinion or opinions are inconsistent with the medical evidence").

This is because, though the ALJ appears to address inconsistencies elsewhere in the decision, he appears to be cherry picking only inconsistencies that support his findings.  "The term 'cherry' picking generally refers to improperly crediting evidence that supports findings while ignoring evidence from the same source."  *Sheila Renee H., Plaintiff, v. Kilolo Kijakazi, Acting Comm'r of Soc. Sec., Defendant*., No. 3:21-CV-00944*(TOF), 2022 WL 4181723, at *7 (D. Conn. Sept. 13, 2022).  The ALJ cites to a specific portion of a PCA Pain Care records earlier in the decision for the proposition that the plaintiff had "some reported improvement in her activities of daily living and quality of life" after visiting her pain management provider.  (S*ee* Tr. 20).  This treatment note is from June 25, 2020, and indeed explains that taking painkillers "works great for

[the plaintiff,] improves her ADL[20] and quality of life." (Tr. 1158).  However, at her very next visit a month later, providers noted that the plaintiff "is having a hard time this month with her pain levels. She believes maybe her tolerance is building up" and that she takes painkillers up to three times a day "some days as the pain is severe and limiting her ADL / lowering her quality of life around 6 days out of the month." (Tr. 1143).   The "ALJ selectively relied on portions of the record that showed improvement without even addressing the weight of the evidence supporting the fact" that this medication's effectiveness did not continue.   *Loucks*, 2022 WL 2189293, at *2. An ALJ "is not permitted to cherry pick from the treatment record evidence that is inconsistent with the treating source's opinion in order to conclude that such opinion should be accorded less weight nor is he permitted to substitute his own lay opinion for that of a medical source." *Kelly W. v. Kijakazi*, No. 3:20-CV-00948 (JCH), 2021 WL 4237190, at *13 (D. Conn. Sept. 17, 2021). *Accord Kyle Paul S. v. Kijakazi*, No. 3:20-CV-01662 (AVC), 2021 WL 6805715, at *7 (D. Conn. Nov. 16, 2021) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his [or her] determination.").   In fact, a review of the record consistently shows that the plaintiff reported sharp, constant lower back pain, usually between seven and eight on the pain scale, and despite pain medication, from the time of her initial visit to the emergency room up until October 2020. (*See, e.g.*, Tr. 1138-426, 1147, 1169, 1177).  The record shows repeated observations of difficulty sitting and getting up from her chair, (*see e.g.,* Tr. 1141, 1150), and noted "paraspinal tenderness" and decreased range of motion in her back. (Tr. 1151).

Lastly, Dr. Titko's evaluation of the plaintiff's ability to sit for less than an hour is also consistent, if not more lenient, than the plaintiff's own hearing testimony in which she testified

---

[20] In medical terms, "ADL" stands for Activities of Daily Living.

that her lumbar pain limits her ability to sit for no more than twenty to thirty minutes at a time and that "crucial" breakthrough pain occurs frequently despite pain medication.  (*See* Tr. 47-50). Indeed, the new regulations explicitly provide that a source's persuasiveness should be given more weight if it is also consistent with other evidence adduced from "nonmedical sources in the claim." 29 C.F.R. § 416.920c(c)(2)

Accordingly, because the ALJ did not sufficiently articulate his consideration of the consistency of Dr. Titko's opinion with the record as a whole, remand is warranted.  *Pamela P.*, 2020 WL 2561106, at *5 (finding remand warranted when ALJ's assessment of opinion evidence was "conclusory" and failed to explain exactly how a medical opinion was inconsistent with the medical evidence). On remand, the ALJ should explicitly consider and adequately explain the consistency of Dr. Titko's MSS as required under the new regulations.

### 2.	State Medical Consultants' Opinions

Though the plaintiff's briefing is primarily concerned with the ALJ's treatment of Dr. Titko's MSS opinion, the plaintiff argues, in passing, that the ALJ impermissibly substituted his judgment for "all opinion physicians," which would include state agency medical consultants Gerald Fette, M.D. and Lois G. Wurzel, M.D.  (Doc. No. 12-1 at 2).  As the plaintiff does not provide any further argument as to how ALJ's erred in regard to the ALJ's consideration of the state agency consultants' opinions, "the undersigned will not advance arguments related thereto."  *Dana Marie M. v. Comm'r of Soc. Sec.*, No. 621-CV-458GLSCFH, 2022 WL 2314560, at *6 (N.D.N.Y. June 28, 2022).

### 3.	Remand is Warranted

In sum, the Court "concludes that the ALJ failed to provide the court with an adequate explanation of how he considered the most important factors of supportability and consistency in

determining the persuasiveness of the medical opinion evidence and the prior administrative findings, pursuant to the new regulations." *Kyle Paul S.*, 2021 WL 6805715, at *8.  "As such, based on the explanation provided by the ALJ, the court concludes that there is a 'reasonable basis for doubt whether the ALJ applied correct legal principles.'" *Id.* (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).  "Failure to apply the correct legal standards is grounds for reversal." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.").

Therefore, the Court respectfully recommends granting the plaintiff's motion to remand for further administrative proceedings consistent with this opinion.[21]  On remand, the ALJ is to explicitly consider the consistency and supportability factors of the medical opinion evidence and, in turn, the plaintiff's residual functional capacity determination and whether her RFC allows her to perform her past relevant work.  *See Quiles v. Saul*, No. 19-CV-11181, 2021 WL 848197, at *13 (S.D.N.Y. Mar. 5, 2021) ("[T]he ALJ erred in failing to follow the requirements of 20 C.F.R. § 416.920c when evaluating [the plaintiff's] application . . .  and therefore, the ALJ's residual functional capacity determination was based on legal error.").

---

[21] The plaintiff alternatively requests that the court "award her DIB and SSI for" the relevant period.  (Doc. No. 12-1 at 12).  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'" *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  "A record contains 'persuasive proof' of disability when there is 'no apparent basis to conclude' that additional evidence 'might support the Commissioner's decision.'" *Id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)).  "The Court has examined the entire administrative record, and it has not found persuasive proof of the Plaintiff's disability. Remand for calculation of benefits would therefore be inappropriate." *Id.*

### B.      THE VE'S CLASSIFICATION

While the Court does not consider it necessary to address all the plaintiff's remaining arguments, "the [C]ourt nonetheless addresses a few additional issues to guide the ALJ's consideration on remand in the interest of avoiding future remands." *Delgado v. Berryhill*, No. 3:17-CV-54 (JCH), 2018 WL 1316198, at \*16 (D. Conn. Mar. 14, 2018).  Namely, the Court addresses the plaintiff's argument that the ALJ erred at step four in finding that she could perform the job of a telemarketer "as generally performed" according to the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT").  (*See* Tr. 22).  Specifically, it addresses the contention that the plaintiff performed a composite job in her previous work as a telemarketer at the Pelham Education Group.  (*See* Doc. No. 12-1 at 10).

While "[g]enerally, in order to survive step four, the [plaintiff] has the burden to show [both] an inability to return to her previous specific job and an inability to perform her past relevant work generally," the analysis "is different when a claimant, like Plaintiff here, argues that he worked a composite job." *Walterich v. Comm'r of Soc. Sec.*, No. 18-CV-1329, 2020 WL 2078795, at \*3-4 (W.D.N.Y. Apr. 30, 2020).  "A composite job is one that 'ha[s] significant elements of two or more occupations and, as such, ha[s] no counterpart in the DOT.'" *Delgado*, 2018 WL 1316198, at \*16 (quoting Titles II & XVI: Past Relevant Work-the Particular Job or the Occupation as Generally Performed, SSR 82-61 ("SSR 82-61"), 1975-1982 Soc. Sec. Rep. Serv. 836, at \*2 (1982)).  In its Program Operations Manual System ("POMS"),[22] the SSA clarified that "[t]he claimant's [past relevant work] may be a composite job if it takes multiple DOT occupations to locate the main duties of the [past relevant work] as described by the claimant." *See* SSA, POMS,

---

[22] The Second Circuit has held that "POMS guidelines are entitled to 'substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute.'" *Lopez v. Dep't Soc. Servs.*, 696 F.3d 180, 186 (2d Cir. 2012) (citations omitted).

DI 25005.020 Past Relevant Work (PRW) as the Claimant Performed It (Apr. 13, 2017), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0425005020.

"When an ALJ encounters a composite job, she must evaluate it in accordance with the particular facts of each case." *Walterich*, 2020 WL 2078795, at *4 (citation omitted). "If the ALJ finds that a plaintiff's past relevant work is a composite job, then it cannot suffice at step four as work 'as generally performed in the national economy.'" *Id.* (same). Instead, "when comparing the claimant's RFC to a composite job as the claimant performed it, [the ALJ has to] find the claimant capable of performing the composite job only if he or she can perform all parts of the job." *Id*. "To classify an applicant's 'past relevant work' according to the least demanding function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act." *Weiser v. Berryhill*, No. 1:16-CV-00763(MAT), 2018 WL 6011163, at *3 (W.D.N.Y. Nov. 16, 2018)

Here, the plaintiff proffers that her prior work as a telemarketer was a composite job because she spoke to and consulted face-to-face with prospective students and lead walking tours of the school multiple times a day, and neither of these duties are contemplated in the DOT's description of a Telemarketer.[23] Her hearing testimony affirms these additional duties and was unchallenged. (*See* Tr. 40-44). The plaintiff contends that these additional duties are in line with those found in the DOT as a Guide (DOT 353.367-014)[24] and Sales Representative, Education

---

[23] The DOT describes the Telemarketer position as someone who "[s]olicits orders for merchandise or services over telephone: Calls prospective customers to explain type of service or merchandise offered. Quotes prices and tries to persuade customer to buy, using prepared sales talk. Records names, addresses, purchases, and reactions of prospects solicited. Refers orders to other workers for filling. Keys data from order card into computer, using keyboard. May develop lists of prospects from city and telephone directories. May type report on sales activities."

[24] The DOT describes the Guide position as someone who "[e]scorts group of people through establishment, such as museum, aquarium, or public or historical building, or through historic or scenic outdoor site, such as battlefield, park, or cave, usually following specified route: Lectures concerning size, value, and history of establishment, points out features of interest, and gives other information peculiar to establishment. Answers questions of group. Assumes responsibility for safety of group."

Courses (DOT 259.257-010).[25]  (Doc. No. 12-1 at 6-7).  The Court agrees that the record "evidence appears to indicate that [the plaintiff's] past relevant work contained significant elements of two occupations."  *Delgado*, 2018 WL 1316198, at *18.  *See* POMS, DI 25005.020 ("The claimant's [past relevant work] may be a composite job if it takes multiple DOT occupations to locate the main duties of the [past relevant work] as described by the claimant.")

"Despite this, neither the vocational expert nor the ALJ considered whether [the plaintiff's] past relevant work at [Pelham Educational Group] was a composite job or not."  *Delgado*, 2018 WL 1316198, at *18*.  (*See* Tr. 58-66).  Notably, the transcript shows that, after swearing in the VE, the VE went directly into identifying and summarizing the plaintiff's prior work as a telemarketer under the DOT.[26]  (Tr. 61).  In fact, the VE explicitly acknowledged and took into account the fact that the plaintiff's telemarketing work was performed at that light level rather than sedentary "because of the tours going on" and "the walking."  (Tr. 60).  "This testimony is important because by making references to the exertion level . . . the VE alluded to the existence of another job . . . whose duties Plaintiff may have performed as part of" her work as a telemarketer.  *Walterich*, 2020 WL 2078795, at *5.  *See also Morgan v. Berryhill*, No. 2:16-CV-01052 JRC, 2017 WL 2628094, at *2 (W.D. Wash. June 19, 2017) ("Plaintiff testified, and the VE acknowledged, that plaintiff's job duties included 'enter[ing] stuff into a computer part of the day;

_____

[25] The DOT describes the Sales Representative position as someone who "[s]olicits applications for enrollment in technical, commercial, and industrial schools: Contacts prospects, explains courses offered by school, and quotes fees. Advises prospective students on selection of courses based on their education and vocational objectives. Compiles registration information. May accept registration fees or tuition payments."

[26] The Court acknowledges that the plaintiff's attorney at the hearing did not object to the vocational expert's classification of the plaintiff's past relevant work or raise the issue of a composite job. (*See* Tr. 45). "However, the attorney's failure to do so does not affect the [C]ourt's analysis here because the case is already being remanded to the ALJ for other reasons."  *Delgado*, 2018 WL 1316198, at *18. "Therefore, the court instructs the ALJ to address all errors on remand, whether [the plaintiff's] attorney objected to them or not."  *Id.*

and answer[ing] phones, and [sending] clients to the officers that they needed to talk to; and then part of the day [working] . . . in the mailroom stuffing envelopes and preparing them to be sent out to people.' [ ] It is very clear that plaintiff's work at DSHS was not solely as a 'Data Entry Clerk' or 'Mailroom Clerk.' Rather, it appears that the only way that the 'main duties' of this work can be described accurately is by considering two or more separate DOT occupations.").

Courts in this Circuit have routinely remanded where the "[p]laintiff's testimony, at the very least, created a possibility that her past work was a composite job" yet "both the VE and the ALJ ignored any possibility in their analysis that the past relevant work was a composite job." *Cheryl A. v. Comm'r of Soc. Sec.*, No. 20-CV-01649, 2022 WL 1665159, at *4 (W.D.N.Y. May 25, 2022) (collecting cases). "Here, because the case is already being remanded for other reasons, the court orders the ALJ on remand to obtain sufficient information about [the plaintiff's] past relevant work, to consider whether such work should be treated as a composite job, to articulate his reasons for the determination he makes, and to assess the rest of step four accordingly." *Delgado*, 2018 WL 1316198, at *19. "The court further reminds the ALJ that, because [the plaintiff's] RFC may change after full [consideration] of the record, as noted above, either way the ALJ is likely to need to reconsider his step four analysis to determine whether a person with [the plaintiff's] RFC can perform h[er] past relevant work." *Id.*

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the Court respectfully recommends that the plaintiff's Motion to Reverse/Remand the Decision of the Commissioner (Doc. No. 12) be **GRANTED** and that the defendant's Motion to Affirm (Doc. No. 14) be **DENIED**.

Upon remand, the ALJ shall (1) properly and thoroughly evaluate the medical opinions under the new regulations and, in turn, reevaluate the plaintiff's RFC; (2) evaluate whether the plaintiff was performing a composite job; and, (3) undertake any other further administrative

proceedings, consistent with this recommended ruling.  To be clear, "the Court offers no opinion on whether the ALJ should or will find plaintiff disabled on remand."  *Juan T. v. Kijakazi*, No. 3:20-CV-01869(SALM), 2021 WL 4947331, at *9 (D. Conn. Oct. 25, 2021).

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

Dated this 28th day of November, 2022 at New Haven, Connecticut.

 _/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge